IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOEL HAVEMANN,

    *Plaintiff*,

    v.

MICHAEL J. ASTRUE,
Commissioner, Social Security
Administration,

    *Defendant*.

Civil Action No. ELH-10-1498

## MEMORANDUM OPINION

This case concerns the redaction of personal identifying information from data disclosed

by the Social Security Administration ("SSA") to a journalist, Joel Havemann, in response to

requests submitted by Havemann pursuant to the Freedom of  Information Act ("FOIA"), 5

U.S.C. § 552, *et seq*.  Claiming that these redactions violate SSA's disclosure obligations under

FOIA, Havemann seeks injunctive relief compelling the full release of the requested records.

*See* Complaint ¶¶ 5-14 (ECF 1).[1]  Having released records on more than 140 million individuals,

SSA filed a Motion for Summary Judgment on the grounds that further disclosure would

constitute a "clearly unwarranted invasion of personal privacy" under 5 U.S.C. § 552(b)(6), and

that the remaining data is therefore exempt from disclosure under FOIA.  The Motion has been

fully briefed, and no hearing is necessary to resolve it.[2]  *See* Local Rule 105.6.  For the reasons

that follow, I will grant the Motion.

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this matter
arises under federal law.

[2] SSA filed the Motion on October 13, 2011, but it did not become ripe until June 7,
2012.  *See* Motion for Summary Judgment and Memorandum in Support (collectively, "Motion"

**Factual Background**

Joel Havemann, formerly a reporter for the *Los Angeles Times*, is a freelance journalist currently working on a story about social security benefit payments that he hopes to publish with the *National Journal*.  Complaint ¶ 5.  On March 10, 2010, based on information gleaned from a former SSA employee, Ronald Cooley, Havemann submitted six FOIA requests to SSA, seeking the production of a wide variety of data concerning benefits decisions for individual social security recipients.  *See* Complaint Exh. 1; Wiggins Decl. ¶¶ 8-25.  In particular, Havemann sought information from two SSA databases: the Supplemental Security Record ("SSR") and the Master Beneficiary Record ("MBR").  *See* Complaint Exh. 1; Wiggins Decl. ¶¶ 8-25.

The SSR contains information used to administer the Federal Supplemental Security Income ("SSI") benefit program, including a record of each individual who has applied for SSI benefits and each individual who has applied for and is entitled to "Special Veterans Benefits" under Title VIII of the Social Security Act.  Wiggins Decl. ¶ 10 n.1, ¶ 12.  The MBR holds records for every beneficiary of Old Age, Survivors, and Disability Insurance ("OASDI") under

---

or "MSJ") (ECF 27 & 27-1).  In support of its Motion, SSA offered the Declarations of Dawn Wiggins, the Freedom of Information Officer for SSA's Office of Privacy and Disclosure ("ODP") and Deputy Executive Director of ODP, who was personally involved in responding to Havemann's FOIA requests ("Wiggins Decl.") (ECF 27-2), and Vickie Gregory, the Director of the Potential Entitlement Staff with SSA's Office of Quality Performance ("Gregory Decl.") (ECF 27-32).  Havemann filed Memorandum of Points and Authorities in Opposition to the Motion on December 15, 2011, ("Response" or "Opposition") (ECF 32), accompanied by a Declaration of his consultant, Ronald Cooley ("Cooley Decl.") (ECF 32-2).  After obtaining several extensions (ECF 34, 36, 38, 40), SSA filed its Reply in Support of its Motion on April 13, 2012 ("Reply") (ECF 41), along with a Supplemental Declaration of Vickie Gregory ("Supp. Gregory Decl.") (ECF 42-1), and the Declaration of Daniel Zabronsky, Director of Statistics and Modeling within SSA's Office of Quality Performance and a member of SSA's Data Disclosure Review Board ("Zabronsky Decl.") (ECF 42-6).  On June 7, 2012, with leave of court, Havemann filed a Surreply in Response to Defendant's Reply ("Surreply") (ECF 48), accompanied by a Supplemental Declaration by Ronald Cooley ("Supp. Cooley Decl.") (ECF 48-1).

Title II of the Social Security Act, and contains information on claimants whose benefits were denied or disallowed, as well as information about individuals eligible for SSI payments. *Id.* at ¶ 13 n.2. SSA maintains these databases in its regular course of business. Gregory Decl. ¶ 8.

SSA, like other federal agencies, has issued regulations to address privacy concerns relating to public disclosure of private data. *See* 20 C.F.R. § 402.100(b) (explaining that "in [SSA's] evaluation of requests for records[, SSA] attempt[s] to guard against the release of information that might involve a violation of personal privacy because of a requester being able to 'read between the lines' or piece together items that would constitute information that normally would be exempt from mandatory disclosure under Exemption Six"); *see also* 45 C.F.R. § 164.514(b)(2)(i) (HHS regulation listing eighteen data fields to be withheld from disclosure requests to de-identify records, including "[a]ll geographic subdivisions small than a State" and "[a]ll elements of dates (except year) for dates directly related to an individual").

At issue here are the disclosures made by SSA in response to Havemann's FOIA Requests I, II and V.[3] In addition to SSA employees specifically tasked with evaluating disclosure requests, several SSA employees with other primary responsibilities devoted significant time and resources to determine the extent to which disclosure was feasible to satisfy Havemann's requests. *See* Supp. Gregory Decl. ¶¶ 119-24.

*FOIA Request I*

In FOIA Request I, the "Veteran Couple FOIA Request," Havemann asked for SSR records for married couples who, because at least one member of the couple received a pension

---

[3] Although SSA did not immediately disclose the records sought in Requests III, IV, and VI, Havemann was satisfied with the records that SSA eventually disclosed. MSJ Exh. 1-Q (ECF 27-19) (FOIA III disclosure letter); MSJ Exh. 1-T (ECF 27-22) (FOIA IV disclosure letter); MSJ Exh. 1-Z (ECF 27-28) (FOIA VI disclosure letter).

or other compensation from the Department of Veterans Affairs for age, blindness, or disability, were denied SSI benefits on the grounds of excess income.  *See* MSJ Exh. 1-A (ECF 27-3). Havemann's stated interest in the data is to shed light on SSA's handling of a regulatory policy concerning war veterans and their spouses who receive a VA pension and also file for SSI benefits.  Cooley Decl. ¶ 20a.  SSA initially advised Havemann that it could not provide the records sought in FOIA Request I.  MSJ Exh. 1-I (ECF 27-11).  However, on November 10, 2010, after reevaluating the feasibility of disclosure, SSA released a subset of the information Havemann sought.  MSJ Exh. 1-J (ECF 27-12).  The table below compares, in the left-hand column, the data sought by Havemann against, in the right-hand column, the data released by SSA.  *See* Reply Exh. 4B (ECF 42-3).  Data fields not released or released in part are identified by italic font.

| FOIA Request I (Veteran Couple Request) | |
|---|---|
| **Data Requested** | **Data Released** |
| Social Security Number ("SSN") or alternative identifier | Alternative identifier[4] |
| Current or last shown "Master Record"[5] | Yes |
| *Address with 9-digit zip code* | *No (only initial 5 digits of zip code released)* |
| *SSI application date* | *No* |
| *Code for most recent state and county of residence* | *No (only state code released)* |
| Current SSI status | Yes |
| Reason for SSI denial | Yes |
| Date of status change due to excess income | Yes |
| Disability Payment Code[6] | Yes |

[4] Rather than providing social security numbers, SSA used an alternative identifier, as suggested in Havemann's request.  MSJ Exh. 1-A at 3.

[5] The "Master Record" refers to a 2-character code indicating, for example, whether the individual is an aged individual with an eligible spouse or an aged individual with an ineligible spouse.  *See* Reply Exh. 4B at 1.

[6] The Disability Payment Code is a code used to describe the type of disability benefit award.  *See* Reply Exh. 4B at 2.

| | |
|---|---|
| Ledger Account File ("LAF") Code[7] | Yes |
| *Date of birth* | *No (only year released)* |
| Earned income | Yes |
| Unearned income | Yes |

Despite these withholdings, Havemann received most of the requested fields of data for each record.  Specifically, SSA released 15,096 electronic records in response to FOIA Request I.  Gregory Decl. ¶ 9.

*FOIA Request II*

In FOIA Request II, the "QMB Medicare FOIA Request," Havemann requested SSR and MBR data for SSI recipients over the age of 65 who are not currently receiving OASDI benefits, along with data indicating enrollment in Medicare Part A and other Medicare information.  *See* MSJ Exh. 1-B (ECF 27-4).  Havemann's stated interest in the data is "to shed light on . . . SSA's handling of referrals of SSI recipient[s] for Premium Part A Medicare . . . through the QMB program."  Cooley Decl. ¶ 20b.  SSA initially advised Havemann that it could not provide the records sought in FOIA Request II.  MSJ Exh. 1-M (ECF 27-15).  However, on November 10, 2010, after reevaluating the feasibility of disclosure, SSA released a subset of the information Havemann sought.  MSJ Exh. 1-N (ECF 27-16).  The table below compares, in the left-hand column, the data sought by Havemann against, in the right-hand column, the data released by SSA.  *See* Reply Exh. 4B.  Data fields not released or released in part are identified by italic font.

| FOIA Request II (QMB Medicare Request) | |
|---|---|
| **Data Requested** | **Data Released** |
| SSN or alternative identifier of the primary | Alternative identifier[9] |

---

[7] The Ledger Account File code is a 3-digit code indicating the individual's current payment status under Title II Old Age, Survivors, and Disability Insurance payment.  The LAF code is displayed in the SSR database, but created and managed from the MBR database.  Reply Exh. 4B at 9.

| record holder[8] | |
|---|---|
| Current or last shown "Master Record" | Yes |
| *9-digit zip code* | *No (only initial 5 digits of zip code released)* |
| SSI application date | Yes |
| *Code for most recent state and county of residence* | *No (only state code released)* |
| "Individual Recipient Identification" Code[10] | Yes |
| Current "Payment Status Code" | Yes |
| "Beneficiary Identification Code" ("BIC")[11] | Yes |
| *Date of birth* | *No (only year released)* |
| LAF Code | Yes |
| March 2010 Federal SSI amount payable | Yes |
| State SSI payment level | Yes |
| Hospital insurance enrollment and supplemental medical insurance information | Yes |
| Citizenship/alien status | Yes |

Despite the withholdings, Havemann received the majority of the requested fields of data for each record.  Specifically, SSA released 903,572 electronic records in response to FOIA Request II.  Gregory Decl. ¶ 9.

*FOIA Request V*

In FOIA Request V, the "MBR Request," Havemann requested MBR data on deceased

---

[9] Rather than providing social security numbers, SSA opted to use an alternative identifier for the record, as suggested by Havemann.  MSJ Exh. 1-B at 3 (ECF 27-4).

[8] Each record in the databases, including those detailing the benefits of family members or other beneficiaries, is identified by the primary record holder's SSN.  The primary record holder is the individual whose status permits benefit payments to family members or other beneficiaries.  In turn, each beneficiary is identified by the "Beneficiary Identification Code," which indicates the relationship between the primary record holder and the beneficiary (e.g., a BIC of "B" identifies the beneficiary the primary account holder's living wife, and "C1" identifies the primary account holder's first child).  Supp. Gregory Decl. ¶¶ 28-35.  The term "auxiliary" is also used to represent a beneficiary in such records.

[10] The Individual Recipient Identification code is a 2-digit code that defines the individual within the database (e.g., "DC" represents "disabled child").  Reply Exh. 4B at 5.

[11] *See* note 8, *supra*.

"primaries" (*i.e.*, the SSN "holders" on whose earnings the MBR record is based) and any

beneficiary also on that primary's record.  *See* MSJ Exh. 1-E (ECF 27-7).  Havemann's stated

interest in the data is to shed light on SSA's administration of Title 38 of the United States Code,

and in particular those provisions dealing with veterans' pensions, benefits claims, and outreach.

*See* Cooley Decl. ¶ 20c.  On September 19, 2010, SSA asked Havemann to clarify FOIA Request

V, and on June 22, 2011, provided a subset of the information Havemann sought.  Def. Exh. 1-V,

1-W.  The table below compares, in the left-hand column, the data sought by Havemann against,

in the right-hand column, the data released by SSA.  *See* Reply Exh. 4B.  Again, data fields not

released or released in part are identified by italic font.

| FOIA Request V (MBR Request) | |
|---|---|
| **Data Requested** | **Data Released** |
| *SSN of the deceased primary record holder* | *No[12]* |
| BIC | Yes |
| "Payment Identification Code"[13] | Yes |
| SSI entitlement and termination dates | Yes |
| *Code for most recent state and county of residence* | *No (only state code released)* |
| Primary Insurance Amount ("PIA")[14] | Yes |
| Month and year of PIA | Yes |
| *9-digit zip code* | *No* |
| *Date of birth* | *No (only year released)* |
| LAF code | Yes |
| *Monthly Benefit Amount ("MBA")[15]* | *No* |

---

[12] Each category of data that was withheld was withheld only for deceased primary record holders with living auxiliaries, and for the living auxiliaries.  Such data was otherwise released for records of deceased primary record holders whose auxiliaries were also deceased.  *See* Reply Exh. 4B.

[13] The Payment Identification Code is an alpha-numeric code that identifies the type of payment being made to a beneficiary.  Wiggins Decl. ¶ 22.

[14] PIA represents the benefit an individual would have received if he or she had elected to receive benefits at the normal retirement age.  Wiggins Decl. ¶ 22.

| | |
|---|---|
| *Monthly Benefit Payment ("MBP")*[16] | *No* |
| SSI benefit type | Yes |
| SSI status code | Yes |

Despite these withholdings, Havemann received the majority of the requested fields data for each record.   Specifically, SSA released 140,917,347 records in response to FOIA Request V. Gregory Decl. ¶ 9.

## Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   In resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  The "judge's function" in reviewing a motion for summary judgment is not

---

[15] MBA represents the "monthly benefit amount," which is the total benefit amount before any deductions for Medicare, overpayment recovery, or other income is made.  Gregory Decl. ¶ 95.

[16] MBP represents the portion of the MBA paid after deductions.  Gregory Decl. ¶ 96.

"to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. There is a dispute of material fact that precludes summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "As a general rule, . . . FOIA determinations should be resolved on summary judgment." *Hanson v. U.S. Agency for Int'l Devel.*, 372 F.3d 286, 290 (4th Cir. 2004).

## Discussion

"The Freedom of Information Act was enacted to facilitate public access to Government documents," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (citation omitted), and to vindicate the public's right to know "what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989) (quotation marks omitted). Consistent with this objective, FOIA requires that "each [federal] agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any) and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

An agency's disclosure obligations are not unlimited, however. "While the FOIA generally authorizes disclosure of information contained in public records, it also expressly recognizes that the public interest is not always served by disclosure." *U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*, 833 F.2d 1129, 1134 (4th Cir. 1987). Thus, an agency may withhold information where a record falls within one of FOIA's nine specific statutory exemptions. *See* 5 U.S.C. § 552(b) (listing exemptions); *U.S. Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 494 (1994) ("*FLRA*") (noting that FOIA incorporates "a

general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language" (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976))); *Hanson*, 372 F.3d at 290 (explaining that nine FOIA exemptions "are designed to safeguard various public interests against the harms that would arise from overbroad disclosure").

When seeking to withhold information, the agency bears the burden of showing that the records fall within one of FOIA's specific exemptions to disclosure.  5 U.S.C. § 552(a)(4)(B); *City of Va. Beach, Va. v. U.S. Dep't of Commerce*, 995 F.2d 1247, 1252 (4th Cir. 1993). "The government can meet this burden by describing the withheld material with reasonable specificity and explaining how it falls under one of the enumerated exemptions."  *Hanson*, 372 F.3d at 290 (citation omitted).  No deference is owed to the agency's determination to withhold records, however.  5 U.S.C. § 552(a)(4)(B).  Nevertheless, affidavits submitted by an agency are entitled to "'a presumption of good faith.'"  *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (quoting *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).

At issue in this case is 5 U.S.C. § 552(b)(6) ("Exemption 6"), which exempts from FOIA's mandate all "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  Exemption 6 permits a federal agency to withhold records where (i) the disputed records constitute "personnel," "medical," or "similar files," (ii) the disclosure of which would amount to a "clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6); *see Core v. U.S. Postal Serv.*, 730 F.2d 946, 947 (4th Cir. 1984) ("If the files fall within [the 'similar files'] definition, the remaining issue is whether disclosure would constitute a clearly unwarranted invasion of personal privacy.").  The purpose

of this exemption is "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Core*, 730 F.2d at 947 (citing *U.S. Dep't of State v. The Wash. Post Co.*, 456 U.S. 595, 599 (1982)).

i.       *Similar Files*

There is no dispute that the social security records at issue in this case qualify as "similar files." 5 U.S.C. § 552(b)(6). The term "similar files" covers "detailed Government records [concerning] an individual [that] can be identified as applying to that individual." *Wash. Post*, 456 U.S. at 602 (quoting H.R. Rep. No. 89-1497, at 11 (1966)); *Core*, 730 F.3d at 947. The data at issue here, including social security numbers, addresses, names, and information regarding eligibility or application for benefits, are all linked with specific individuals, and hence satisfy the first requirement for nondisclosure. *See, e.g.*, *Wash. Post*, 456 U.S. at 600 (indicating that "[i]nformation such as place of birth, date of birth, date of marriage, employment history, and comparable data" qualifies for consideration under Exemption 6).

ii.      *Clearly Unwarranted Invasion of Privacy*

The more difficult question presented here is whether disclosure of the withheld information would "constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). To determine whether disclosure would give rise to a "clearly unwarranted" invasion of privacy under Exemption 6, "'a court must balance the public interest in disclosure against the interest Congress intended the [e]xemption to protect.'" *FLRA*, 510 U.S. at 495 (alteration in original) (quoting *Reporters Comm.*, 489 U.S. at 776). This entails a three-step inquiry. First, an agency must articulate a non-speculative privacy interest in the requested records. *See Nat'l Ass'n of Retired Fed. Empls. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989) ("If no significant

privacy interest is implicated (and if no other Exemption applies), FOIA demands disclosure.")
(citing *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989)).   Second, a court must verify
the existence of a public interest in disclosure.   *See, e.g.*, *Reporters Comm.*, 489 U.S. at 771-75.
In so doing, "the only relevant 'public interest in disclosure' to be weighed . . . is the extent to
which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing]
significantly to public understanding *of the operations or activities of the government*.'"   *FLRA*,
510 U.S. at 495 (alterations and emphasis in original) (quoting *Reporters Comm.*, 489 U.S. at
775).   Finally, a court must weigh the two interests, mindful that even a very slight privacy
interest trumps an insubstantial public interest, *see id.* at 500, and that a speculative privacy
interest can never justify withholding, even in the absence of a powerful public interest.   *See*
*Horner*, 879 F.2d at 874.

> a.  *Privacy Interests*

SSA identifies two core privacy interests that it contends are implicated here.   First,
"[t]he privacy interest protected by Exemption 6 'encompass[es] the individual's control of
information concerning his or her person,'" *FLRA*, 510 U.S. at 500 (alteration in original)
(quoting *Reporters Comm.*, 489 U.S. at 763), because, as numerous courts have recognized,
"individuals generally have a large measure of control over the disclosure of their own identities
and whereabouts."   *Horner*, 879 F.2d at 875; *see Am. Fed. of Gov't Empls., AFL-CIO, Local
1923 v. U.S. Dep't of Health & Human Servs.*, 712 F.2d 931, 932 (4th Cir. 1983) (per curiam)
(upholding SSA's decision to withhold from labor unions the home addresses of employees
under Exemption 6).   This interest "does not dissolve simply because that information may be
available to the public in some form."   *FLRA*, 510 U.S. at 500; *see Reporters Comm.*, 489 U.S. at

763-71 (discussing privacy interest in controlling disclosure of identifying information in light of centralized computer databases).

In *FLRA*, for example, labor unions sought disclosure of FLRA employees to assist in union-related communications. *See* 510 U.S. at 490. The Supreme Court held that, notwithstanding the public availability of employee names and addresses, the employees had a significant interest in controlling information related to their identities. *See id.* at 500. This interest is enhanced when information is "compiled through the power of the State," such that individuals have little choice or control over the initial disclosure and subsequent use of the data. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 170-72 (2004) (applying Exemption 7 to law enforcement documents).[17]

Individuals who apply for or receive various Social Security benefits are required by law to provide personal identifying information and data on income, family status, and medical records, as well names, addresses and other identifying information. Wiggins Decl. ¶ 59. To protect the confidentiality of this information, SSA maintains the requested records in databases subject to the Privacy Act of 1974, 5 U.S.C. § 552a, from which the records cannot normally be

---

[17] *Favish* addressed disclosure of graphic crime-scene photographs under Exemption 7, which pertains to records "compiled for law enforcement purposes." 541 U.S. at 164-65 (quoting 5 U.S.C. § 552(b)(7)). Exemption 7 also differs from Exemption 6 in that it permits withholding of records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," whereas Exemption 6 requires that such an invasion be "clearly unwarranted." *See id.* at 165-66. Nevertheless, I believe that *Favish* makes clear that the privacy interest in controlling personal information is particularly sensitive to an individual's choice in disclosing such information to the state, and where compiled through the state's coercive power, that privacy interest is heightened. *See id.* at 172. As the Supreme Court observed in *Whalen v. Roe*, 429 U.S. 589, 605 (1977), "[t]he collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces, and the enforcement of all criminal laws all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed."

released without the individual's written consent.  *Id.* § 552a(b)(2); Wiggins Decl. ¶ 58. Accordingly, there is a significant privacy interest in the control of private information maintained in SSA's databases.  *See Favish*, 541 U.S. at 166 (observing that "[t]here is special reason, therefore, to give protection to this intimate personal data, to which the public does not have a general right of access in the ordinary course"); *Doe v. Gen. Servs. Admin.*, 544 F. Supp. 530, 533 (D. Md. 1982) (discussing purposes of Privacy Act, including Congressional finding that "the increasing use of computers and sophisticated information technology . . . has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information").

Second, substantial privacy interests are implicated by the disclosure of information that has the potential to invade an individual's privacy or harm the individual through commercial or criminal use.  *See, e.g.*, *Local 1923*, 712 F.2d at 932 (finding that employees had "a strong privacy interest" in home addresses because "[d]isclosure could subject the employees to an unchecked barrage of mailings and perhaps personal solicitations"); *Core*, 730 F.2d at 948-49 (holding that unsuccessful applicants to Department of Justice had strong privacy interests in nondisclosure of application files because of potential embarrassment or harm).  As documented in FOIA Tables I, II and V, *supra*, the released records include the type, source, and amount of household income, the government benefits to which the individual is entitled, and health insurance information—information that would be of significant interest for commercial or even criminal purposes.  *See, e.g.*, *Horner*, 879 F.2d at 876.  Thus, there is a clear privacy interest in limiting the production of millions of these social security records.

Recognition of these privacy interests is only the beginning, not the end, of the inquiry, because SSA must also demonstrate that the privacy interests at stake are more than speculative. *Dep't of the Air Force v. Rose*, 425 U.S. 352, 378 (1976) (rejecting as privacy interest a slight possibility that disclosure might trigger recollection of an individual based on generic descriptions); *Horner*, 879 F.2d at 874 (requiring "substantial, as opposed to *de minimis*, privacy interest"). Here, as redacted, the records released to Havemann were "de-identified." *See* 5 U.S.C. § 552(b) (requiring disclosure of reasonably segregable data). In other words, absent further disclosure by SSA, the records remain unassociated with any name, address, birth date, zip code, or other information that could identify a beneficiary. The strength of the privacy interests discussed above is thus contingent on the likelihood that the release of the disputed data would "link" these private records to specific individuals. *See, e.g.*, *Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1050-51 (D.C. Cir. 2009) (listing cases recognizing privacy interests in financial information and data that could lead to identification of an individual's financial information); *Horner*, 879 F.2d at 878 ("For the Exemption 6 balance to be implicated, there must, of course, be a causal relationship between the disclosure and the threatened invasion of privacy.").

Critically, although speculative privacy interests can never justify withholding, *see Rose*, 425 U.S. at 378-80 & n.19, an individual's privacy interest does not diminish merely because several steps are needed to connect private information to the individual's identity. *See Consumers' Checkbook*, 554 F.3d at 1049-51 (finding privacy interest in data that could be combined to reveal private information); *Horner*, 879 F.2d at 878 (explaining that "[w]here there is a substantial probability that disclosure will cause an interference with personal privacy, it

matters not that there may be two or three links in the causal chain"). And, even where data may seem innocuous or is otherwise publicly available, it may implicate an individual's privacy interest because of the context in which it is disclosed or other information with which it is or can be associated. *See Consumers' Checkbook*, 554 F.3d at 1049-51; *Aronson v. Dep't of Hous. & Urban Dev.*, 822 F.2d 182, 186 (1st Cir. 1987). For example, an isolated piece of data, such as a year of birth, may not reveal much information about an individual. But, when coupled with the month of birth, the marginal effect of knowing the year increases exponentially, and even more so when the third missing field, the day of birth, is disclosed.

In *Consumers' Checkbook*, for example, the plaintiff submitted a FOIA request to the Centers for Medicare and Medicaid Services (CMS) for release of data pertaining to the Medicare claims submitted by various physicians during 2004, including the diagnosis, type and place of service, and the Unique Physician Identifying Number ("UPIN"). *Id.* at 1049. A physician's name, office zip code, specialty, and UPIN were publicly available online, as were the fees received from Medicare for performing a specific procedure. *Id.* Thus, "[c]ombined with the publicly available fee schedule, the data requested . . . [could have been] used to calculate the total payments Medicare made to any individually identified physician for claims submitted in 2004." *Id.* In holding that Exemption 6 justified CMS's withholding of the requested records, the court found that the potential to link private information with physicians' identities invaded the physicians' "substantial privacy interest in the total payments they receive from Medicare for covered services." *Id.* at 1051.

Citing *Department of the Air Force v. Rose*, 425 U.S. at 378, 380 n.19, Havemann suggests that that this "link in the chain" rationale has been rejected as relying on an overly

speculative privacy interest. *See* Opposition at 15-22; Surreply at 6-7; *see also Norwood v. F.A.A.*, 993 F.2d 570, 574-75 (6th Cir. 1993).

In *Rose*, plaintiffs sought the release of redacted case summaries on honor and ethics hearings of Air Force cadets. 425 U.S. at 354-55. The Air Force asserted a privacy interest on the grounds that the case summary for one of the hearings, notwithstanding redaction, might "trigger recollection of identity" by another former cadet solely through the redacted summary. *Id.* at 378. In rejecting the sufficiency of this interest, the Supreme Court observed that Exemption 6 requires "threats to privacy more palpable than mere possibilities." *Id.* at 380 & n.19. Some circuits have interpreted *Rose* as limiting Exemption 6's privacy interest to situations where the information would, by itself, identify an individual. *See Norwood*, 993 F.2d at 574-75 ("[A] view of protecting privacy – excluding from disclosure any and all fragments of information that might assist a diligent researcher in identifying a person – is not supportable."); *Arieff v. U.S. Dep't of the Navy*, 712 F.2d 1462, 1468 (D.C. Cir. 1983) (asserting in dicta that Exemption 6 "does not apply to an invasion of privacy produced *as a secondary effect* of the release. . . . [I]t is the very 'production' of the documents which must 'constitute a clearly unwarranted invasion of personal privacy.'") (Emphasis in original).

The privacy interest asserted in *Rose*, however, was categorically different from the rationale presented here. As the D.C. Circuit has since explained:

> The concern in *Rose* is not . . . with the number of steps that must be taken to get to the threatened effect; rather, *Rose* turns upon the likelihood that the effect will ever come to pass. In that case, there was substantial doubt that any invasion of privacy would occur, and it was that uncertainty that led the court to rule as it did.

*See Horner*, 879 F.2d at 878. In other words, "the Court's concern is not limited to those FOIA cases, if any such cases there be, in which the feared invasion of privacy is caused by the release

itself." *Id.*   The dispositive question where linking is concerned is thus the likelihood that the asserted invasion of privacy will result.  *See id.*

In detailed affidavits and briefing materials submitted here, SSA offers explanations of how each piece of withheld data could be manipulated to attribute private financial information – such as benefit status and amounts – to particular individuals, akin to the concern in *Consumers' Checkbook*.  Indeed, the record reflects that nondisclosure was a carefully considered decision by SSA based on the way that each field of data interacts with the information already released to Havemann, as well as publicly available information.  According to SSA, linkage can occur in two ways.

First, certain fields of the withheld data function as "unique identifiers."  Supp. Gregory Decl. ¶ 11.  A unique identifier, like a SSN, is a field of data that is defined to identify a single individual.   *Id.*   Where an interested party has a record from one database with a unique identifier, a simple search of a target database that includes the same unique identifier will permit matching of the records from both databases.  *Id.* at ¶ 12.

Relevant to this case, the SSNs of deceased primary record holders with living auxiliaries, withheld with respect to the FOIA V release, would, when coupled with the data already available, link the auxiliaries to a variety of private information.  As indicated in the FOIA V Table, that release already contains a field of data for a living auxiliary's Beneficiary Identification Code or "BIC."  Although a living auxiliary's BIC is not unique (it merely identifies the relationship between the living auxiliary and the deceased primary), the Master Beneficiary Record ("MBR") database uniquely identifies living auxiliaries by the combination of a BIC and the SSN of the primary record holder.  Supp. Gregory Decl. ¶¶ 28-31.  Because

SSA has already released the BIC for every record responsive to FOIA Request V, as well as Requests II and VI, *see* Reply Exh. 4B, disclosure of the primary record holder's SSN would uniquely identify each beneficiary.  Supp. Gregory Decl. ¶ 33; Reply at 8.  Notably, this unique identifying information can be matched to data in the publicly available Death Master File ("DMF"), a database that contains a variety of information about deceased individuals, including the individual's social security number and full name; codes indicating how death was verified; dates of birth and death; state and county code of residence; zip code of last residence; and zip code of where the last lump sum payment was sent.  Gregory Decl. ¶ 42.  By matching the SSN for these records to the DMF, an interested party would be able to link the names, addresses, and other information to the record of a deceased "primary," and in turn, the income levels and benefits of the living auxiliaries. Supp. Gregory Decl. ¶ 34-35; Gregory Decl. ¶ 125.  In my view, release of the SSNs at issue for FOIA V would jeopardize personal privacy.

Second, although not all data fields qualify by definition as unique identifiers, many data fields may nevertheless identify specific records based on the context in which they are used. These "functionally unique identifiers" are elements of data that, alone, do not by definition uniquely identify an individual, but will identify an individual when combined with other information or simply because there happens to be only one record in a database with a specific value.  Supp. Gregory Decl. ¶¶ 13-19.  Data such as zip codes, county codes, and birth dates are all functionally unique identifiers, because they can be used in concert with other data to identify specific individuals.  *See, e.g.*, Latanya Sweeney, *Weaving Technology and Policy Together to Maintain Confidentiality*, 25 J. L., Med. & Ethics 98, 98-110 (June 1997) (finding that 69% of

individuals on the Cambridge, Massachusetts voter lists were uniquely identified by birth date and five-digit zip code).

SSA asserts that the remaining withheld data fields – the county codes, zip codes, and full birth dates withheld from FOIA Requests I, II and V; the SSI application date withheld from FOIA Request I; and the MBA/MBP withheld from FOIA Request V – serve as "functionally unique identifiers." Supp. Gregory Decl. ¶¶ 13-14. It recounts how the release of this additional data would permit cross-referencing between all of the data sets released to Havemann, as well as publicly available databases, such that private information can be identified as belonging to a specific individual. As SSA explains, an interested party with these additional data fields would only need to conduct sequential searches based on unique or functionally unique identifiers to narrow down a target database until a single record is located. *Id.* at ¶¶ 15-19. The data sets that have *already* been released can be filtered through, for example, matching of a SSN, *see id.* at ¶¶ 38-46 (filtering MBR/FOIA V using release of SSN for 56 million records where both primary and beneficiaries are deceased); *id.* at ¶¶ 47-54 (filtering DMF with same released SSNs); a state code, *see id.* at ¶¶ 55-61 (filtering FOIA I, II and V by released state code); a zip code, *see id.* at ¶¶ 62-65 (filtering FOIA I and II and DMF by released zip codes); or a spouse's information, *see id.* at ¶¶ 66-69 (filtering FOIA I and V by released spousal records).

According to SSA, further disclosure would enable matching between the data releases to identify a specific person. *Id.* at ¶¶ 13-14. To illustrate, if Havemann received the month of birth in addition to the year of birth, records released in response to FOIA Request V could be manipulated to identify a specific person. Zabronsky Decl. ¶¶ 55-62. The number of individuals identifiable through this method of cross-referencing would increase if full zip codes were also

released.  *Id.* at ¶ 91 ([I]t is a matter of fact that most individuals [with records in the MBR] in the 02720 zip code are the only ones who have their birthdate."); Reply Exh. 5-I (ECF 42-15). This is likewise the case for a combination of the county code and birth date.  Zabronski Decl. ¶¶ 80-84.  By providing SSI application dates for FOIA II but not FOIA I, zip codes for FOIA I but not FOIA II, and unearned income for FOIA I but not MBA/MBP for FOIA V, SSA maintains that it has prevented an interested party from attempting such matching.  *See* Supp. Gregory Decl. ¶¶ 70-75.

Havemann suggests that SSA's piecemeal release of data shows the arbitrary nature of its decision to withhold.  I am not persuaded that such "inconsistencies" in disclosure are arbitrary or otherwise undermine SSA's justifications for withholding data.  *See* Opposition at 22-24.  It is also worth noting that failing to calibrate each data release would not only enable the use of functionally unique data for cross-database identification, *see, e.g.*, Reply Exh. 5E-5H, but would also make it more difficult for SSA to respond to future FOIA requests, because of the variety of information previously released.  This, in turn, would impinge on SSA's ability to respond consistently to disclosure requests without jeopardizing individual privacy.  *See* Reply at 24.

And, as SSA further illustrates, matching between the requested data fields will yield a "superset" that can subsequently be linked to publicly available databases.  *See* Gregory Decl. ¶¶ 44-69 (matching birth dates and zip codes); *id.* at ¶¶ 70-81 (matching SSI application dates); *id.* at ¶¶ 82-94 (matching zip codes); *id.* at ¶¶ 95-113 (matching MBA and MBP); *id.* at ¶¶ 114-23 (matching county codes); *id.* at ¶¶ 124-25 (matching SSN of deceased individuals).  By pairing the FOIA releases with information that is publicly available, through the DMF or online resources such as the Social Security Death Index, LexisNexis, www.intelius.com, and various

other search engines, private information in the FOIA records can be connected to a wealth of publicly available identifying information.  *Id.* at ¶ 17.  In sum, SSA contends that the inclusion of any of the additional fields would allow an interested party to connect the released income, benefits and other financial information to a particular individual.

The Supreme Court has made clear that "the identity of the requesting party has no bearing on the merits of his or her FOIA request," *Reporters Comm.*, 489 U.S. at 771, and because FOIA requires disclosure of non-exempt material to "any person," *Horner*, 897 F.3d at 875 (quoting 5 U.S.C. § 552(a)(3)), the likelihood of a privacy invasion must be evaluated without regard to the identity of the requester and as if disclosure is to be made to the public. *See id.*  Furthermore, the data matching procedures described by SSA require only "basic to intermediate ACCESS skills."  Gregory Decl. ¶ 19.  In light of SSA's detailed demonstrations, the likelihood of an invasion of privacy should such data be disclosed is "more palpable than mere possibility."  *Compare Rose*, 425 U.S. at 378, 380 n.19.

We live in an age where threats to privacy are a very real danger, enabled by extensive publicly available data on individuals.  *See, e.g.*, *Social Security and Death Information: Hearing Before the H. Comm. on Ways and Means and Subcomm. on Social Security*, 112th Cong., Feb. 2, 2012 (statement of Michael J. Astrue, Comm'r, Social Security Admin.), Reply Exh. 5 (ECF 42-5) ("Identity theft is a spreading plague on our Nation. . . .  Unfortunately, public access to the DMF has created opportunities for criminals.  The media has reported incidents involving the use of death data to commit tax fraud."); *see also Greidinger v. Davis*, 988 F.2d 1344, 1352-54 (4th Cir. 1993) (discussing threats to privacy associated with disclosure of SSNs and private information more generally).  Data "linking," as demonstrated by SSA, presents a concrete risk

of a serious invasion of privacy.  The addition of unique or functionally unique identifiers to the FOIA release could expose the identity associated with a record, along with highly private information, through the manipulation of both the FOIA releases and publicly available data.

I recognize that in *Dayton Newspapers, Inc. v. Department of Veteran Affairs*, 257 F. Supp. 2d 988, 1001-02 (S.D. Ohio 2003), the court said that "the sophistication of online search engines should not be cited by the Government as a justification to withhold information, where no bona fide privacy concern would exist under Exemption 6 were it not for such sophistication." Much has changed since that decision was issued in 2003.  In my view, the practical reality of modern and ever changing technology requires the consideration of the sophisticated ways in which publicly available data may be used in conjunction with a FOIA release to invade personal privacy.  *Cf. Senior Execs. Assoc. v. United States*, No. 8:12-cv-02297-AW, 2012 WL 4039814, at *7 (D. Md. Sept. 13, 2012) ("The right to informational privacy assumes added importance in the realm of cyberspace due to the gathering and almost instantaneous transmission of vast amounts of information. For better or worse, the Information Age has drastically increased the availability and transferability of compromising information; it behooves courts to consider this phenomenon in response to requests to shield sensitive data.").  Consequently, I find that there is a tangible privacy interest in withholding the remaining information in response to FOIA Requests I, II and V.

   *b.  Public Interest in Disclosure*

Having gauged the privacy interest at stake, the next step of the inquiry is to evaluate the extent of the public interest in disclosure.  *See Reporters Comm.*, 489 U.S. at 771.  Just as the privacy interests implicated by disclosure must be evaluated for each field of data, so too must

the public interest.  *See* 5 U.S.C. § 552(b) (requiring disclosure of reasonably segregable data); *Favish*, 541 U.S. at 172 ("First, the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake.  Second, the citizen must show the information is likely to advance that interest.  Otherwise, the invasion of privacy is unwarranted.").

Generally speaking, Havemann's purpose of acquiring information serves the goals of FOIA, to "shed[] light on an agency's performance of its statutory duties," *FLRA*, 510 U.S. at 496 (quoting *Reporters Comm.*, 489 U.S. at 773), because he intends to use the data to investigate the effectiveness of SSA's administration of its various statutory obligations.  *See* Cooley Decl. ¶¶ 20a-c.  But, the general purpose of Havemann's work is not dispositive.  The public interest to be evaluated is not the interest in Havemann's project as broadly defined, but rather the public interest, on the margin, in disclosure of the remaining records.  *See Favish*, 541 U.S. at 172.

SSA's disclosures have provided Havemann with records for more than 140 million individuals.  The records include extensive data concerning income levels and sources, decisions on benefits eligibility, the reasons underlying those decisions, health status and insurance information, benefits paid to auxiliaries, and even social security numbers.  As is evident from the FOIA release tables, *supra*, Havemann has more than adequate data to ascertain whether SSA is overpaying or underpaying benefits, whether certain categories of beneficiaries have been "left behind," and whether SSA appears to be cooperating with the VA.  Moreover, as discussed below, he does not adequately explain why the data currently provided does not fully satisfy the goals envisioned by FOIA.

Havemann asserts that he and his consultant, Cooley, would like to work with data that "pertains to individuals," in order to show that SSA could identify underpaid individuals. Opposition at 11.  This ignores the fact that the records he already possesses "pertain to individuals," because each record represents a single person.  In his Surreply, plaintiff suggests that "huge public benefits" will accrue to underpaid social security recipients and taxpayers as a result of his work, in the form of "large sums of money."  Surreply at 4-5.  I am not persuaded. Not every "public benefit," however noble or altruistic, is within the "public interest" to be considered in evaluating a FOIA exemption, *i.e.*, whether the information would shed light on SSA's performance of its statutory duties.  *See FLRA*, 510 U.S. at 497-98.  *FLRA* is instructive.

In that case, labor unions sought disclosure of federal employees' addresses to facilitate communications.  *See id.* at 500.  As the Court explained "[t]rue, unions have a special interest in identifying and communicating with persons in the bargaining unit, an interest initially accommodated by [the Labor Statute].  The bargaining process facilitation interest is ultimately unavailing, however, because 'it falls outside the ambit of the public interest that the FOIA was enacted to serve' . . . ."  *Id.*  Ultimately, the question is whether the information reflects the *agency's* conduct, not whether it could lead to a public benefit.

Whereas underpayment and overpayment visibly reflect on SSAs statutory obligations, the identification of a specific zip code to "say something definitive about the income of [a] communit[y]," Surreply at 6; Supp. Cooley Decl. ¶ 44, ultimately "reveals little or nothing about [the] *agency's* own conduct."  *FLRA*, 510 U.S. at 496 (emphasis added) (quoting *Reporters Comm.*, 489 U.S. at 773); *see* Wiggins Decl. ¶ 69.  This is equally so for county codes.  Supp. Cooley Dec. ¶ 45 ("People want to know how the losses of government funds suffered by

individuals are affecting their regions."). Although it is certainly enlightening for the casual reader or policy analyst to see how different communities are affected by social security benefits, SSA does not, so far as this Court is aware, treat beneficiaries differently based on their zip code or county of residence, and Havemann has not indicated otherwise. Thus, Havemann has principally articulated an interest in possessing information on private citizens or communities that "falls outside the ambit of the public interest that FOIA was intended to serve." *FLRA*, 510 U.S. at 500; *see also Reporters Comm.*, 489 U.S. at 766 n.18 (observing that "the identity of the individuals given public relief or involved in tax matters is irrelevant to the Public's understanding of the Government's operation," even though "public relief and income tax assessments . . . are proper subjects of public concern") (citing S. Rep. No. 89-813, at 7 (1965) & H.R. Rep. No. 89-1497, at 8 (1966)).

With regard to birth dates, Havemann has adequate data to vindicate the public interest in evaluating SSA's performance. As SSA explains, Havemann does not necessarily need a month or day of birth to determine benefit eligibility. Individuals become eligible for the benefits Havemann is investigating at either age 50 or age 60. Thus, for any given reference date, eligibility will only be impossible to determine for two birth years. For instance, in the year 2012, Havemann will only be prevented from precisely determining eligibility status for individuals born in 1952 and 1962. But even for individuals born in those two years, SSA explains how Havemann can obtain almost 100% accuracy on eligibility determinations: "On December 31, 2012, there will be a 99.7% (100 x 36[4]/36[5]) probability that anyone born in 1952 has turned 60 and that anyone born in 1962 has turned 50." Reply at 22; *see* Supp. Gregory Decl. ¶ 82. Even if Havemann would like to ascertain eligibility for a different reference date, a

full birth date would not enlighten him as to his stated purpose: whether a beneficiary is overpaid or underpaid.  Moreover, SSI is a needs-based program, for which a beneficiary becomes "eligible" based on the date the application is filed.  *See* Gregory Decl. ¶ 70.  Therefore, birth date would not indicate whether benefits were timely paid.  In my view, Havemann has not adequately articulated why this additional information will advance the asserted public interest. *Favish*, 541 U.S. at 172.

Nor does Havemann require SSNs in response to his FOIA V request to determine income levels for the potential VA death pension beneficiaries whose records were disclosed in response to FOIA Request IV.  *See* Cooley Decl. ¶¶ 57-58.  As SSA explains, to determine this eligibility, all that is needed is

> a one-column list containing the Social Security benefit received by every surviving spouse of a service member listed in the FOIA IV release.  The number of entries in the one-column list would tell [Plaintiff] how many surviving spouses may be implicated and the benefit amount will provide the indication of whether the income threshold level for a VA death pension has been exceeded.

Reply at 21; Supp. Gregory Decl. ¶ 76.

In sum, notwithstanding Havemann's personal stake in providing as much detail as possible in his article, or Cooley's preference for working at the most granular level of data possible, that is simply not the goal that Congress envisioned in passing FOIA.  Consequently, the Court finds that the public interest in disclosure is low.

### c.  Balancing Test

Weighing the substantial privacy interests burdened by disclosure of information that could associate data on benefits, insurance, and financial status with specific individuals against the marginal effect of disclosure in furthering FOIA's goals, I am persuaded that SSA is not

obligated to fulfill the remainder of Havemann's requests.  A negligible public interest will be outweighed by even a very slight privacy interest, *Horner*, 879 F.2d at 873, and FOIA requests implicating intimate personal data require a particularly weighty public interest, because "where the subject of documents 'is a private citizen,' 'the privacy interest . . . is at its apex.'" *Favish*, 541 U.S. at 166 (quoting *Reporters Comm.*, 489 U.S. at 780) (omission in original).

In this case, the disclosure of the additional data fields would jeopardize the privacy interests that FOIA seeks to protect through Exemption 6.  On the other hand, Havemann has data sufficient to evaluate the performance of SSA with respect to its statutory mandates, and there is scant evidence that further disclosure of the disputed data will advance that interest.  As SSA suggests, "[e]ven assuming that Plaintiff has the general goal of showing that a category [of] Social Security beneficiaries exists who could be getting paid more benefits, that does not provide justification for unnecessarily exposing the private information of those very same beneficiaries to identification."   Reply at 2.   Thus, disclosure would constitute "a clearly unwarranted invasion of personal privacy" under 5 U.S.C. § 552(b)(6), and SSA is justified in withholding the remaining data.

### Conclusion

For the foregoing reasons, the Court will grant summary judgment in favor of SSA. Therefore, plaintiff's motion for attorney's fees and costs is denied.  A separate Order follows.


Date: September 24, 2012                              _____/s/_____
                                                     Ellen Lipton Hollander
                                                     United States District Judge